

FILED by ___ D.C.

NOV 1 4 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

COMMODITY FUTURES TRADING
COMMISSION,

               **Plaintiff**

vs.

DONALD O'NEILL, et al.



               **Defendants,**

DANIELLE O'NEILL, et al.

           **Relief Defendants.**

Civil Action No. 02-61307
CIV-GOLD
Magistrate Judge Simonton

# CLOSED
# CIVIL
# CASE

### Order of Permanent Injunction and Entry of Final Judgment by Default
### Against Defendants

      This matter is before the Court upon the Plaintiff Commodity Futures Trading

Commission's ("Commission") Motion For Sanctions on Defendants' Failure to Provide

Discovery.

      On June 23, 2003, Defendant Donald O'Neill ("O'Neill") was served with a notice to

appear at deposition. Service was properly made to his last known address, pursuant to Fed. R.

Civ. P. 5(b)(2)(B). Defendant O'Neill failed to appear at the deposition. Defendant O'Neill has

departed from his last known address and failed to leave a forwarding address within any

participant in this case, including his attorneys. He has also failed to respond to Plaintiffs

attempts to contact him. He has further failed to respond to Plaintiff's Request to Admit.

Further, O'Neill's failure to appear at his properly noticed deposition testimony violated both the

Court's Statutory Restraining Order of September 18, 2002 [DE #20] and the Consent Decree

and Order of Preliminary Injunction of October 4, 2002 [DE # 30], both of which allow the

Plaintiff Commission expedited discovery authority, including the taking of depositions.

The Commission has now submitted a Motion For Sanctions on Defendants' Failure to

Provide Discovery Against Defendants pursuant to Federal Rules of Civil Procedure 37(d).  The

Court has carefully considered the Complaint, the aforementioned Motion and other written

submissions of the Commission filed with the Court, and all oppositions thereto, and being fully

advised in the premises, hereby

**GRANTS** the Commission's Motion For Sanctions on Defendants' Failure to Provide

Discovery Against Defendants and enters findings of fact and conclusions of law finding the

Defendants liable as to all violations as alleged in the Complaint.  Accordingly, the Court now

issues the following Order of Permanent Injunction and Entry of Final Judgment By Default

Against Defendants Donald O'Neill, Frecom Technology Corporation, Momentum Trading

Group, Ltd., NDT Fund, LLC, Orca Funds, Inc., Orca Capital Fund A, LLC, Orca Mohave A,

LLC, Orca Hopi A, LLC, and Shelaley Holdings, LLC (collectively "the Defendants") on the

issues of liability and orders further submissions as to the issues of appropriate civil monetary

penalties, restitution and disgorgement.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### THE COURT FINDS THAT:

1.  Defendant O'Neill's behavior has shown a willful disregard for the discovery process and

has acted in bad faith.

2.  There is no practical sanction or meaningful relief in the circumstances presented.

3.  This Court has jurisdiction over the subject matter of this action and Defendants pursuant to

Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief

2

against any person whenever it shall appear that such person has engaged, is engaging or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

4.   Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1, in that the Defendants are found in, inhabit and transacted business in the Southern District of Florida, and the acts and practices in violation of the Act occurred within this district, among other places.

## A. The Parties

5.   **Donald Craig O'Neill** ("O'Neill") is a Florida resident.  O'Neill was the mastermind and central figure in the Orca Common Enterprise, and the principal beneficiary of the fraud.  He has never been registered with the Commission in any capacity.

6.   **Frecom Technology Corporation,** which sometimes did business as "Frecom Traders Group" or "Frecom Currency Traders Group, Ltd." ("Frecom"), is a Delaware corporation that designates in its certificate of incorporation its principal place of business as One East Broward Boulevard, Suite 700, Fort Lauderdale, Florida 33301.  Donald C. O'Neill is listed as President, Director, registered agent, and secretary in the corporate records filed with the State of Florida on May 23, 2001. Frecom has never been registered with the Commission in any capacity.

7.   **Momentum Trading Group, Ltd.**. ("Momentum") is a Nevada corporation whose certificate of incorporation reflects its principal place of business as 500 East Broward, Suite 1620, Fort Lauderdale, Florida 33394.  Momentum's incorporator and president is O'Neill.  Momentum has never been registered with the Commission in any capacity.  Momentum began soliciting customers in or around May 2001.  On September 14, 2001, Momentum dissolved.  Momentum has never been registered with the Commission in any capacity.

3

8.      **NDT Fund, LLC** ("NDT") is a Florida company whose articles of organization identify its principal place of business as 14001 NW 22nd Court, Pembroke Pines, Florida 33028. NDT was formed by O'Neill on May 3, 2001. Its certificate of incorporation lists O'Neill and his brother, Robert O'Neill, as Managers. NDT solicited and accepted customer money since at least May 2001. NDT has never been registered with the Commission in any capacity.

9.      **Orca Funds, Inc.** ("Orca Funds") was, until at least July 2002, located at 500 E. Broward Boulevard, Suite 1620, Fort Lauderdale, Florida 33394. Orca was incorporated in Florida on September 14, 2001, the same day that Momentum dissolved. Donald O'Neill was listed as an initial director. Orca purported at times to be a "hedge fund," and to manage three constituent funds, as follows:

> a.  **Orca Capital Fund A, LLC** ("Orca A") was incorporated in Florida on September 24, 2001.
>
> b.  **Orca Mohave A, LLC** ("Orca Mohave") was incorporated in Florida on October 31, 2001.
>
> c.  **Orca Hopi, LLC** ("Orca Hopi") was incorporated in Florida on January 11, 2002.

10. **Shelaley Holdings, LLC** ("Shelaley") is a Nevada company whose articles of incorporation list Danielle O'Neill as sole managing member. Shelaley gave Donald O'Neill trading power of attorney over customer funds that it managed at Global Futures and Forex, Ltd. Shelaley has never been registered with the Commission in any capacity.

11. These corporate defendants together constitute a common enterprise ("Orca Common Enterprise"). O'Neill has or had control over all the entities of the Orca Common Enterprise. O'Neill and the Orca Common Enterprise are collectively "the Defendants."

4

## B.  Summary

12. Starting in January 2001 and continuing through at least July 2002, Donald O'Neill, the individual Defendant, operating through a series of companies that constitute the Orca Common Enterprise and that he owned, controlled or managed, solicited investments totaling least $13 million from at least 29 customers for the purpose of trading primarily foreign currency futures contracts.  Through those companies, some of whose operations he referred to as a "hedge fund" or an "alternative asset management" firm, O'Neill misappropriated a minimum of $10.6 million of those investor funds and used the money for business, personal and luxury expenditures.  When soliciting the funds initially, and in lulling certain investors who inquired about the value of their accounts, Defendants also made materially false statements about their experience and track record, sent fraudulent account statements, and made other blatant misrepresentations and falsifications.

13. Investor funds collected by the Orca Common Enterprise, or assets purchased with those funds, were transferred to relief Defendants Danielle O'Neill, O'Neill's wife; Nancy Iagrossi, O'Neill's mother-in-law; and Robert O'Neill.

14. Defendants' scheme involves soliciting customer funds for the purpose of trading primarily foreign currency futures contracts.  To date, Defendants have traded some portion of investors' funds, sustaining an overall net trading loss of around $487,000.  They also misappropriated a minimum of $10.6 million of customer funds.

15. O'Neill spent at least $5.75 million of the misappropriated funds to finance an extravagant lifestyle that included a nearly-$3 million home for himself and two other houses for his wife and mother-in-law in an exclusive Florida coastal community; several high-end automobiles; more than $900,000 in airplane charters; and junkets to Las Vegas over a period of 45 days (accompanied by business colleagues and a high-priced call girl) that resulted in gambling losses of over $800,000.

5

O'Neill also wrote sizeable checks to cash, to himself and to the family members named as Relief Defendants, above, among others.

16. To maintain customer confidence, O'Neill sent phony account statements that completely misrepresented the customers' account balances and the trading activity in their accounts, including at least one account statement that was entirely fabricated using the "trading" output of a dummy account.

17. Furthermore, O'Neill told some customers that he traded their funds at two brokerage firms, when those firms in fact were only corporate accommodation addresses and never existed as going concerns. O'Neill even fabricated correspondence from one of the fictitious firms to himself that he later provided to customers.

18. O'Neill and the Orca Common Enterprise solicited customers using private placement memoranda and websites replete with material, flat-out falsehoods. O'Neill claimed to have hundreds of millions of dollars under management, although he never did. He also claimed to have substantial trading experience with a financial firm that did not exist. He further made material false statements about the Defendants' trading track record.

### C.      The Orca Common Enterprise

19.      The Defendants have engaged in a common scheme orchestrated by O'Neill to solicit investments from customers for the purpose of foreign currency trading, and then steal their money. O'Neill is the primary salesman, trader and manager of the scheme.

20.      The Orca Common Enterprise consists of the entity Defendants, each of which was controlled, operated and/or managed by O'Neill. Orca Funds, an entity in the common enterprise was marketed at times as a "hedge fund." All common enterprise entities had either bank or brokerage accounts in their names, and many had both. O'Neill routinely moved money between

6

and among accounts held in the name of various Orca Common Enterprise entities without regard to corporate niceties. Each entity operated out of wherever O'Neill was doing business at the time. Where multiple entities overlapped chronologically, they all operated out of a common office. Other than at formation, the companies in the Orca Common Enterprise held no directors' meetings and maintained no minutes of the approval of corporate actions. No person other than O'Neill had the ultimate say over the operation of any entity in the Orca Common Enterprise.

      **D.**        **<u>Fraudulent Solicitation of Investors</u>**

    21.     Defendants, claiming that one or more entities in the Orca Common Enterprise operated as "hedge funds," have solicited customers using a number of techniques, including advertisements on the website www.thestreet.com; relationships with persons employed by entities in the Orca Common Enterprise; investor conferences at which O'Neill gave presentations touting his management and trading services; private placement offering memoranda; and websites of several Orca Common Enterprise entities.

    22.     Some of the solicitation material, including the private placement offering memoranda and the websites, were rife with fraudulent representations, ranging from huge discrepancies between the amounts Defendants claimed to have under management and the amounts they actually controlled, to flat-out lies about O'Neill's trading track record, professional experience and academic background.

    23.     Specifically, on the www.orcafunds.com website, in private placement memoranda and on account statements provided to customers, O'Neill claimed that he or entities in the Orca Common Enterprise managed either $200 or $300 million in investor funds. In private placement memoranda soliciting investments in Orca Common Enterprise entities, O'Neill claimed that he was a highly successful currency trader, such that he "consistently outperformed the leading market

7

indices over the past three years." Also in those memoranda, O'Neill claimed to be a highly experienced trader, with a "wealth of international business and global finance expertise" with "several years of trading experience in the hedge/currency environment, ... work[ing] with respected trading houses such as Nakamura Security Holdings in Munich ... ." Finally, O'Neill claimed to be a graduate of the University of Nebraska, to have lettered on Nebraska's football team, and to have garnered a graduate degree in business organizations from Clemson University,.

24.    All those statements, which were designed to gain investor confidence by bolstering O'Neill's apparent experience, training and ability to handle the funds of his prospective and existing investors, were completely false. O'Neill had no such trading track record. In fact, he sustained almost a half-million dollar net loss in the limited trading he did for customers. Further, O'Neill had no such business experience. Nakamura was a virtual business address in Munich that O'Neill himself created with the assistance of an overseas business services company. It never operated as a going concern. Finally, O'Neill had no such education. He attended the University of Nebraska for one year, and neither received a degree nor a letter in any sport. Clemson University does not even offer the degree O'Neill claimed to have received, and states that O'Neill was never a student there.

25.    The Defendants collected at least $13 million from at least 29 customers during the period January 1, 2001 through July 2002.

26.    Once the Defendants collected customer money, they commingled the funds with other customer funds in various bank accounts at First Union National Bank in Florida, in brokerage accounts at Global Futures Trading, Inc. in Michigan, and in other at least three other commodity futures accounts and one other securities brokerage account. The money flowed in large quantities, and frequently, between and among the different financial accounts, usually winding up far from where it was initially supposed to go.

8

### E.        Defendants Sustained Net Losses Trading Customer Funds

27.        Trading only a minority of the funds invested with them, and generally only for short time periods at that, Defendants nevertheless transferred substantial investor funds into and out of foreign currency futures trading firms such as Hotspot FX, Inc. of New Jersey, Global Futures and Forex, Ltd. of Michigan ("GFT"), Refco Group Ltd., LLC of New York, and Forex Capital Markets, LLC.  All of those firms are registered with the Commission as futures commission merchants ("FCMs").  For a brief period, Defendants also used customer funds to trade securities at Blackwood Securities, a day-trading securities firm no longer in existence, which cleared through Penson Financial, a registered securities broker-dealer located in Texas.  Most of those funds, however, were either parked at those firms briefly before being transferred out again to non-trading accounts, or were traded for only brief periods.

28.        Defendants lost approximately $372,000 trading foreign currency futures contracts.

29.        Defendants also lost approximately $115,000 trading securities at Blackwood Securities through Penson Financial.

30.        In total, O'Neill and the Orca Common Enterprise sustained trading losses totaling approximately $487,000.

### F.        Defendants Provided Customers with False and Fabricated Account Statements and with Fictitious Correspondence and Insurance Policies

31.  O'Neill generally sent false statements to customers, if he sent the statements at all.

32.  O'Neill provided at least one customer with a trading statement that he had fabricated from a computer run of "trades" in a dummy or "demo" account that did not involve the trading of real funds.

33.  O'Neill told certain customers that he was trading with or transferring their funds to a brokerage firm in Germany, Nakamura Securities ("Nakamura").  In fact, no such firm exists in

9

Germany. Nakamura existed only as a "virtual company" that O'Neill established with a corporate hosting company in Munich, as a website that O'Neill registered but never activated, and as e-mail addresses O'Neill established through with Microsoft's free e-mail service, Hotmail.

34.     O'Neill provided certain customers with copies of e-mails and letters purportedly sent by Nakamura staff to O'Neill, discussing certain funds transfers and investments. However, O'Neill actually created and sent to himself the purported correspondence from Nakamura, and then provided it to customers to exonerate himself from blame for, and to obfuscate queries about, delays in transferring and returning customer funds and responding to customer inquiries.

35.     O'Neill also provided a phony "insurance policy" to the Native American tribal investors, purporting to insure their investments against fraud, among other things. The policy was ostensibly issued by or through Nakamura.

36. O'Neill also told at least one customer that his funds were being transferred to Alexus Capital Group, purportedly an Australian financial services company. In fact, Alexus Capital Group is not registered with the Australian authorities, but is instead a purported "shelf company" offered through an Internet corporate hosting company to businesses in need of a corporate shell. The hosting company is located in the Pacific island nation of Vanuatu. O'Neill never transferred any funds to Alexus Capital Group.

### G.     Defendants Misappropriated At Least $10.6 Million in Customer Funds

37.     O'Neill misappropriated at least $10.6 million of customer funds. Among the customers whose investments were stolen to feed O'Neill's lifestyle were family members and friends of his Orca business colleagues, and two tribes of Native Americans.

38.     The Native Americans were particularly hard-hit by the fraud O'Neill perpetrated with the Orca Common Enterprise. The Hopi Tribal Housing Authority, an agency of the Hopi tribe

10

located in New Mexico, and the Fort Mojave tribe located in Arizona, separately invested a total of nearly $10 million with Orca through its purported constituent funds, Orca Mohave and Orca Hopi, between October 2001 and January 2002.

39.     O'Neill subsequently sent fictitious account statements to the trading advisor for those tribes, showing that the investments were profitable.

40.     Although he was, in fact, trading a minority of the invested funds and eventually returned some of the funds to the tribes -- O'Neill misappropriated most of the money and converted it to other purposes, principally for his own use and benefit.

41.     Representative of the fate of funds provided by smaller investors are the following two examples:

    a.  In January 2002, one customer invested $50,000 with Orca through its purported constituent fund, Orca Capital A.  No portion of his funds was ever used for trading or investment purposes; instead, O'Neill converted it all, spending it on payroll, office and personal expenditures, and to provide payments to certain customers; and

    b.  In June 2002, a customer invested $100,000 through Orca Capital Fund A, and O'Neill converted all of those funds to non-investment, non-trading uses.  Nearly $60,000 was sent to the Native American tribes, and another $25,000 disappeared into payroll, office and O'Neill's personal expenditures.

42.     Overall, of the minimum of $13 million collected by the Orca Common Enterprise, O'Neill and his entities sustained aggregate net trading losses of at least $487,000, and refunded approximately $1.9 million to customers.  O'Neill therefore misappropriated at least $10.6 million.

43.     O'Neill used the misappropriated funds for various purposes, including payments for the following personal expenditures, among many others:

11

a.　　　　　Three trips to Las Vegas between January and March 2002, during which O'Neill lost nearly $900,000 gambling;

b.　　　　　A down payment of approximately $1 million and subsequent monthly mortgage payments on the $3 million house he purchased in the exclusive Lighthouse Point neighborhood of Broward County, Florida;

c.　　　　　At least $900,000 in private jet charters;

d.　　　　　Frequent cash gifts of $5,000, $10,000 and $20,000 to Relief Defendants Danielle O'Neill, Nancy Iagrossi, Robert O'Neill, friends and others; and

e.　　　　　personal goods and services, some of which he gave to or shared with Relief Defendant Danielle O'Neill, including clothing, vacations, expensive cars, a JetSki, and watches;

f.　　　　　online wine auctions, online gambling enterprises, call girls and a mistress.

### H.　**Controlling Person**

44.　O'Neill is a director, officer and/or manager of every company in the Orca Common Enterprise.  He signed checks, directed that checks be signed, authorized wire transfers, signed correspondence, dealt with customers, ordered computer trading interfaces from forex futures commission merchants, hired and fired staff, solicited customers, opened, closed and traded forex accounts and directed the expenditure of the investors' proceeds.

**CONCLUSIONS OF LAW
VIOLATIONS OF THE
COMMODITY EXCHANGE ACT AND REGULATIONS**

45.         Section 2(c)(2)(B)(i)-(ii) of the Act, 7 U.S.C. § 2(c)(2)(B)(i)-(ii) (2001), provides

that the CFTC shall have jurisdiction over an agreement, contract or transaction in foreign currency

that is a contract of sale of a commodity for future delivery, so long as the contract is "offered to, or

entered into with, a person that is not an eligible contract participant" unless the counterparty, or the

person offering to be the counterparty, is a regulated person or entity, as defined therein.

46.         Section 1a(12)(A) of the Act, 7 U.S.C. § 1a(12)(A) (2001), defines eligible

contract participants using a number of criteria.  For example, Section 1a(12)(A)(xi) identifies an

eligible contract participant as an individual who has total assets in excess of: a) $10 million; or b)

$5 million and who enters the transaction to manage the risk associated with the asset he owns or

liability incurred, or reasonably likely to be owned or incurred by the individual.  Many of the

foreign currency futures investments Defendants accepted, including various transactions described

in this Complaint, were offered to or entered into with persons who were not eligible contract

participants under this subsection and others.

47.         O'Neill and the various entities of the Orca Common Enterprise acted either as

the counterparties to their customers' transactions or as fraudulent intermediaries between customers

and registered futures commission merchants.  No Defendant is or was a proper counterparty for

retail foreign currency transactions, or acts or acted as a legal intermediary.  Therefore the

Commission has jurisdiction over the Defendants' transactions in retail foreign currency.

**VIOLATIONS OF SECTION 4b(a)(2)(C)(i)-(iii) OF THE ACT:**
**Fraud And Deceit By Means of Misappropriation**
**And Material Misrepresentations, and**
**By Providing False Statements To Investors**

48.   Beginning in at least January 2001 and continuing through at least July 2002, and possibly

longer, by the conduct outlined above, through the use of the mails and other means and

instrumentalities of interstate commerce, Defendants violated Section 4b(a) of the Act, 7 U.S.C. §

6b(a)(2001), in that they have, directly or indirectly, in or in connection with an order to make, or the

making of, a contract of sale of a commodity for future delivery (i) cheated or defrauded or attempted

to cheat or defraud other persons; (ii) willfully made or caused to be made to other persons false reports

or statements relating to futures transactions, or willfully entered or caused to be entered for other

persons false reports thereof; or (iii) willfully deceived or attempted to deceive other persons.

49.     Defendants cheated or defrauded or attempted to cheat or defraud investors or prospective

investors and willfully deceived or attempted to deceive investors or prospective investors by, among

other things:  inducing customers to invest funds for the purposes of trading foreign currency futures

contracts based on materially misleading solicitations; misappropriating funds from investors; and

materially misrepresenting to investors the profits from and value of their investments.  Defendants

therefore violated Section 4b(a)(2)(C)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(C)(i) and (iii) (2001).

50.   Defendants further violated Section 4b(a)(2)(C)(ii) of the Act, 7U.S.C. §6b(a)(2)(C)(ii) (2001),

in that they willfully made or caused to be made materially false reports or statements thereof by

preparing and issuing false trading statements to investors.

51.     Each material misrepresentation or omission, each false report or statement, and each willful

deception made during the relevant time period constitute a separate and distinct violation of Sections

4b(a)(2)(C)(i) - (iii) of the Act, 7 U.S.C. §§6b(a)(2)(C)(i) - (iii) (2001).

52.     Defendants engaged in the conduct described above in or in connection with orders to make,

or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on

behalf of other persons where such contracts for future delivery were or may be used for (a) hedging

any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b)

determining the price basis of any transaction in interstate commerce in such commodity, or (c)

delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment

thereof, pursuant to Section 4b(a)(2) of the Act, 7 U.S.C. §6b(a)(2) (2001).

53.   By the conduct described in Paragraphs 1- 50, above, Orca Common Enterprise is liable

under Sections 4b(a)(2)(C)(i)-(iii), 7 U.S.C. §§ 6b(a)(2)(C)(i)-(iii)(2001), for the foregoing acts and

omissions of its agents, including O'Neill, by operation of Section 2(a)(B) of the Act, 7 U.S.C. § 2

(2001), and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2002).

54.   By the conduct described in Paragraphs 1- 50, above, O'Neill, is liable under Section 13(b) of

the Act, 7 U.S.C. § 13c(b) (2001), for the foregoing acts and omissions of Orca Common Enterprise in

violation of Section 4b(a) of the Act, 7 U.S.C. §6b(a) (2001).  O'Neill actually exercised control or

possessed the authority to exercise control over Orca Common Enterprise, and did not act in good faith

or knowingly induced, directly or indirectly, the acts constituting these violations.

# I.

## ORDER FOR PERMANENT INJUNCTION

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

A.   Defendants, in or in connection with orders to make, or the making of, contracts of sale of

any commodity for future delivery, made, or to be made, for or on behalf of any other persons, is

permanently enjoined and restrained from, directly or indirectly  violating Section 4b(a) of the

Act, 7 U.S.C. § 6b(a) (2001) and  Commission Regulations 1.1(b)(1) and (3), 17 C.F.R.

§1.1(b)(1) and (3) by:

(A)    cheating or defrauding or attempting to cheat or defraud other persons;

(B)     willfully making or causing to be made materially false reports or statements thereof by preparing and issuing false trading statements to investors;

(C)     deceiving or attempting to deceive other persons by any means whatsoever;

B.  Defendants, and any other person, insofar as he or she is acting in the capacity of officer, agent, servant, employer, or attorney of Defendants, and any person insofar as he or she is acting in active concert or participation with Defendants and receives actual notice of this Order by personal service or otherwise, is permanently enjoined, restrained and prohibited from, directly or indirectly:

1.  trading on or subject to the rules of any registered entity as that term is defined by Section 1(a)(29) of the Act, as amended, 7 U.S.C. § 1a(29)(2001);

2.  soliciting, receiving, or accepting any funds in connection with the purchase or sale of any commodity futures contract or option on a futures contract;

3.  engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, directly or indirectly, whether by power of attorney or otherwise;

4.  applying for registration or seeking exemption from registration with the Commission in any capacity, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9)(2001), and engaging in any activity requiring such registration or exemption from registration, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2001), or acting as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2001).  This prohibition includes, but is not limited to soliciting, accepting, or receiving any funds, revenue, or other property

from any person, giving advice for compensation, or soliciting prospective customers, related to the purchase or sale of any commodity futures or options on commodity futures contracts, except as provided for in regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9)(2001).

5.   filing a petition in bankruptcy without providing this Court and the Commission with prompt notice by Certified Mail of such filing.

The injunctive provisions of this Order shall be binding upon Defendants, any person insofar as he or she is acting in the capacity of officer, agent, servant, employer, or attorney of Defendants, and any person insofar as he or she is acting in active concert or participation with Defendants who receives actual notice of this Order.

### *The Appointment of a Receiver*

### II.

1.   Gerald Wald, Esq., the Court appointed Receiver shall:

> A.   take control of the accounts that are subject to the asset freeze imposed by the Court's Statutory Restraining Order, dated June 20, 2003 ("Freeze Order") and the Consent Order Decree and Order of Preliminary Injunction, dated October 4, 2002 . The Defendants shall not retain any right, title or interest in said accounts; and

> B.   enter into such agreements as are necessary to carry out the administration of the receivership, including, but not limited to, the retention and employment of investigators, attorneys or accountants of the Receiver's choice, including without limitation members and employees of the Receiver's firm, to assist, advise, and represent the Receiver.

2.   The Defendants and any other person or entity that receives actual notice of this Order by personal service or otherwise, shall immediately forthwith or within such time as permitted by the Receiver in writing, deliver over to the Receiver:

17

A.    funds, assets, and/or property within their possession or control, owned beneficially or otherwise, wherever situated, which are subject to the Freeze Order;

B.    keys, computer passwords, entry codes, combinations to locks and any other item or information required to open or gain access to the property of the Defendant, wherever situated.

3.    Each firm, corporation or other person or entity with notice which holds, or which is a depository of funds, securities, property, or other assets of the Defendants frozen pursuant to the Freeze Order is prohibited, until further order of the Court, from transferring, withdrawing, or removing any funds, securities, property, or other assets, except for the purposes of transferring such assets to the custody, control and possession of the Receiver.

4.    Except by leave of this Court, during the pendency of the receivership ordered herein, Defendants and all customers, principals, investors, creditors, stockholders, lessors, and other person seeking to establish or enforce any claim, right or interest against or on behalf of the Defendants, and all others acting for or on behalf of such persons, including attorneys, trustees, agents, sheriffs, constables, marshals, and other officers and their deputies, and their respective attorneys, servants, agents and employees be and are hereby stayed from:

A.    commencing, prosecuting, continuing or enforcing any suit or proceeding against Defendants, or any of its subsidiaries or affiliates, except that such actions may be filed to toll any applicable statue of limitations;

B.    commencing, prosecuting, continuing or entering any suit or proceeding in the name or on behalf of Defendants;

C.    accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, the property of Defendants, or any of its subsidiaries or affiliates or any property claimed by  it or attempting to foreclose, forfeit, alter or terminate any of Defendants' interest in property including without limitation, the establishment, granting, or perfection of any security interest, whether such acts are part of a judicial proceeding or otherwise;

18

D.      using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoenas, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wheresoever located, owned by or in the possession of Defendants, or any of their subsidiaries or affiliates, or the Receiver appointed pursuant to this order or any agent appointed by said Receiver; and

E.      doing any act or thing whatsoever to interfere with the Receiver taking control, possession or management of the property subject to this receivership, or to in any way interfere with the Receiver, or to harass or interfere with the duties of the Receiver; or to interfere in any manner with the exclusive jurisdiction of the Court over the property and assets of Defendants, or its subsidiaries or affiliates, including the filing by the Defendant of a petition for relief under the United States Bankruptcy Code, 11 U.S.C. §101 et seq., as to it.

Provided however, nothing in this paragraph shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against Defendants.

5.      The Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to a fee for the performance of duties pursuant to this Order as well as reimbursement for the cost of actual out-of-pocket expenses incurred by them for those services authorized by this Order that when rendered were (1) reasonably likely to benefit the receivership estate or (2) necessary to the administration of the estate. The Receiver and all personnel hired by the Receiver shall be compensated solely out of the assets frozen by the Freeze Order, including any assets acquired after the date of the Court Order, and shall not be entitled to any compensation from the Commission. The Receiver shall file with the Court and serve on the parties requests for the payment of such compensation with the first such request filed no later than 90 days after the filing of this Order. Subsequent requests are to be filed every ninety (90) days thereafter. The requests for compensation shall itemize the time and nature of services rendered by the Receiver and all personnel hired by the

19

Receiver.  The Receiver shall not increase the hourly rate of $225 to be used as the basis for such fee applications without prior approval of the Court.

6.      Defendants shall cooperate with the Receiver to the extent necessary for the Receiver to execute his duties and responsibilities pursuant to this Order, including but not limited to, providing signatures for documents relevant and necessary for the Receiver to carry out his duties and responsibilities pursuant to this Order.

7.      Nothing contained herein shall be interpreted as a waiver of the Defendant's privileges (including attorney-client privilege and other disclosure privileges), work-product or constitutional rights, including rights and privileges under the Fourth and Fifth Amendments to the United States Constitution.

### *Monetary Judgment*

### III.

**IT IS FURTHER ORDERED**  that judgment for civil monetary penalties, restitution and disgorgement is entered in favor of the Commission and against Defendants, and that the Commission shall, within **thirty (30) days of the date of this Order,** submit to the Court and defendants a final proposal for the amounts of civil monetary penalties, restitution and disgorgement to be awarded, and identifying the mechanism by which restitution will be distributed to injured customers.  The Commission may, on or before that date, submit to the Court additional evidence solely as to those issues.  On the same date, the Commission shall also present the Court with a Proposed Order of Judgment on Civil Monetary Penalties, Restitution and Disgorgement as to Defendants.  It is further Ordered that the Defendant may in turn submit evidence as well, solely on the issue of civil monetary penalties, restitution and disgorgement, no later than ten (10) days after service by the Commission.

**IT IS FURTHER ORDERED** any funds provided by Defendants shall be applied first to any restitution amount ordered by the Court. Any amounts available for payment after restitution has been satisfied shall be applied to satisfy any civil monetary penalties ordered by the Court.

*Asset Freeze*

**IV.**

**IT IS FURTHER ORDERED** that the asset freeze pursuant to this Court's Statutory Restraining Order shall remain in full force and effect until further Order of this Court on the question of the sum of restitution, disgorgement and civil monetary penalties.

**V.**

**IT IS FURTHER ORDERED** that, immediately upon service of this Order upon it, Defendants, along with any of their agents, servants, employees or assigns and persons in active concert or participation with it who receive actual notice of this Order by personal service or otherwise, and all other persons or entities served with a copy of this Order, shall immediately or within such time as permitted by the Commission in writing, deliver over to the Receiver:

1. Possession and custody of all funds, assets, property, and all other assets, owned beneficially or otherwise, wherever situated, of Defendants;

2. Possession and custody of documents of Defendants, including but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

3. Possession and custody of all assets belonging to members of the public now held by Defendants;

4. All keys, computer passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or documents of Defendants, including but not limited to, access to Defendants' business premises, means of communication, accounts, computer systems, or other property; and

5. Information identifying the accounts, employees, properties or other assets or obligations of Defendants.

### *Accounting*

### VI.

**IT IS FURTHER ORDERED** that within five (5) business days following the service of this Order, Defendants shall, if it has not done so already:

1. Provide counsel for the Commission and the Receiver with a full accounting of all assets and liabilities of Defendants by completing, signing, and serving on the Commission and the Receiver the "Financial Disclosure Statement" (CFTC Form 13) attached to this Order;

2. Provide counsel for the Commission with a full accounting of all funds, documents, and assets held outside of the United States which are (1) titled in the name individually or jointly of such Defendant; or (2) held by any person or entity for the benefit of the Defendant; or (3) under such Defendant's direct or indirect control, whether jointly or singly;

3. Transfer to the territory of the United States and deliver to the Court all funds, documents, and assets located in foreign countries which are (1) titled in the name

22

individually or jointly of such Defendant; or (2) held by any person or entity for the benefit of any Defendant; or (3) under such Defendant's direct or indirect control, whether jointly or singly; and

## VII.

**IT IS FURTHER ORDERED** that all banks, brokers, savings and loans, escrow agent, title companies, trusts, broker-dealers, other financial institutions or any other persons or entities which are served with a copy of this Order shall cooperate with all reasonable requests of the Commission and the Receiver relating to implementation of this Order.

### *Maintenance of and Access to Records*

## VIII.

**IT IS HEREBY ORDERED** that Defendants and all persons or entities who receive notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business or personal finances of Defendants.

## IX.

**IT IS FURTHER ORDERED** that representatives of the Commission immediately be allowed to inspect the books, records, and other documents of Defendants and their agents including, but not limited to, paper documents, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of Defendants or others, and to copy said documents, data and records, either on or off the premises where they may be situated.

*Service of Order*

## X.

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of Defendant that may be subject to any provision of this Order.

## XI.

**IT IS FURTHER ORDERED** that within seven (7) days after entry of this Order of the Court that Defendants shall serve on the Commission a signed acknowledgement that it has been served with the Order.

*Service on the Commission*

## XII.

**IT IS FURTHER ORDERED** that Defendants shall serve all notices required by this Order, and other materials on the Commission by delivering a copy to Ghassan Hitti, Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581.

## XIII.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action, and of any ancillary or supplemental actions hereto, in order to, among other things, implement and carry out the terms of all orders, judgments, and decrees that may be entered herein, including those that may be necessary to assure compliance with this Order of Permanent Injunction and Entry of Final Judgment By Default Against Defendant.

**SO ORDERED**, at Miami, Florida on this ___*14*___ day of ___*November*___ 2003.

ALAN S. GOLD
United States District Judge

Copies furnished to:

**US Magistrate Judge Andrea Simonton**
**Ghassan Hitti, Esq.**
1155 21st St., NW
Washington, DC 20581
**Donald O'Neill, *pro se***
1098 S. Military Trl., #202
Deerfield Beach, #202 FL 33442
**Gerald Wald, Esq. (Receiver)**
900 Ingraham Building
25 SE 2nd Avenue, Miami, FL 33131