

FILED by _____ D.C.

FEB 1 5 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.- MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 02-61307- CIV-GOLD/ SIMONTON**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br>vs.<br><br>**DONALD O'NEILL**, *et al.*<br><br><br>Defendants,<br><br>**DANIELLE O'NEILL**, *et al.*<br><br><br>Relief Defendants. | |

## SECOND SUPPLEMENTAL ORDER FOR DISBURSEMENT OF RESTITUTION

This matter comes before the Court on Plaintiff Commodity Futures Trading Commission's ("CFTC") Motion and Brief on Disbursement of Restitution (the "Motion"). CFTC files the Motion pursuant to the Court's June 15, 2004 Supplemental Order of Judgment on Restitution and Civil Monetary Penalties Against Defendants **[DE # 154]**.[1] Intervenor Starmark International, Inc. ("Starmark") filed a Response to Plaintiff's Motion and Brief on Disbursement of Restitution **[DE # 164]**. Intervenor Presidential Aviation Leasing, ("Pre sidential") Inc. also filed a Response to CFTC's Motion and Brief on Disbursement of Restitution **[DE # 165]**. Subsequently, CFTC filed a Reply to Intervenors Presidential and Starmark Opposition to Plaintiff's Motion for Disbursement of

---

[1]     Defendants include Donald O'Neill, Frecom Technology Corporation, Momentum Trading Group, Ltd., NDT Fund, LLC, Orca Funds, Inc., Orca Capital Fund A, LLC, Orca Mohave A, LLC, Orca Hopi A, LLC, and Shelaley Holdings, LLC (collectively "the Defendants").

Restitution **[DE # 168]**.   Upon review of the Motion, the Responses, the Reply and applicable case law, I GRANT Plaintiff's Motion and Brief on Disbursement of Restitution.

### I.    Background

On September 17, 2002, CFTC filed a Complaint **[DE # 1]** against Defendants seeking a statutory restraining order, injunctive and other equitable relief.  The Complaint alleged that Defendant fraudulently solicited at least $13 million from investors and misappropriated a minimum of $10.6 million of investor funds that they used for business, personal and luxury expenditures.   The Court entered a Statutory Restraining Order Freezing Assets and Appointing a Temporary Receiver on September 18, 2002 **[DE # 20]**.   On October 4, 2002, the Court entered a Consent Decree and Order of Preliminary Injunction **[DE # 30]** also freezing Defendants' assets, appointing a receiver and staying all actions against the Receiver or Defendants.

Thereafter, the Court entered an Order of Permanent Injunction and Entry of Final Judgment by Default Against Defendants **[DE # 141]** finding that Defendants violated Section 4b(a)(2)(C)(i) through Section 4b(a)(2)(C)(iii) of the Commodity Exchange Act and Regulations.   The Court entered a Supplemental Order of Judgment on Restitution and Civil Monetary Penalties Against Defendants **[DE # 154]** on June 15, 2004.   In the Supplemental Order, the Court awarded CFTC judgment against Defendant for restitution of customer funds   in the amount of $11,519,659.67 and prejudgment interest in the amount of $626,852.33 for a total of $12,146,512.00.   The Court further awarded CFTC a civil monetary penalty against Defendants in the amount of $10,609,133.33.   The Order directed CFTC to submit a list of investors to whom restitution should be made and asked CFTC to propose a distribution scheme, including a determination of the amount to be paid to the third party intervenors, if any.

## II.    The Motion

In the Motion, CFTC has presented a list of investors to the Court and a suggested scheme for distribution of the assets in the receivership estate.  CFTC suggests that this Court approve distribution of the assets in the receivership estate solely to the defrauded investors and distribute the assets on a *pro rata* basis.  (Motion at 3).  CFTC argues that the intervenors, Starmark and Presidential, should not be allowed to participate in the distribution of the receivership assets.  (*Id.* at 4-5).  CFTC maintains that the funds in the receivership estate are in a constructive trust held for the benefit of the defrauded investors and "the claims of the defrauded investors trump all other claims with respect to those assets in the receivership estate."  (*Id.*)

## III.    The Intervenors

On January 22, 2002, Starmark filed a lawsuit in the Florida state court against two of the Defendants in this case - Orca Funds, Inc. ("Orca") and Momentum Trading Group, Inc. ("Momentum"). (Starmark Response at 1). Starmark alleged that Orca and Momentum failed to pay Starmark for advertising and branding services Starmark provided to the two companies. (*Id.* at 1-2). Starmark obtained a default final judgment against Orca and Momentum on September 9, 2002 for $132,024.22.  *(Id.* at 2). Starmark recorded its judgment with the Florida Secretary of State on October 7, 2002. *(Id.)* Starmark filed a Motion for Leave to Intervene in Litigation Solely for the Purpose of Establishing Claim Against Defendants' Frozen Assets **[DE # 90]** in the present action on February 18, 2003.  The Court granted Starmark's Motion for Leave to Intervene **[DE # 103]** on May 2, 2003 allowing intervention on the "limited issue of priority of claims if and when CFTC recovers a judgment against the defendants."

On May 23, 2002, Presidential filed a lawsuit in the Florida state court against four[2] of the Defendants in this case - Frecom Technology Corporation ("Frecom"), Donald O'Neill, Momentum Trading Group, Inc. d/b/a Orca Funds, Inc. and Orca Capital Fund, LLC. (Presidential Response at 1). Presidential alleged that these Defendants failed to pay Presidential for charter air services. (*Id.* at 1). Presidential obtained a default final judgment against these Defendants on February 5, 2003.[3] (*Id.* at 2). Presidential vaguely asserts that "Presidential became a judgment creditor before the Court granted final default judgment for CFTC here" but Presidential has failed to provide the Court with any record evidence either to support this contention or to show the date on which Presidential became a judgment creditor. (*Id.* at 6).

Presidential moved to intervene **[DE # 49]** in the present action on October 24, 2002. The Court granted Presidential's Motion to Intervene **[DE # 64]** on November 21, 2002 allowing Presidential to "participate in the determination of priority of claims if and when plaintiff recovers a judgment in this case."

Intervenors argue that they should share in the distribution of assets in the receivership estate for two reasons. First, they argue that CFTC cannot establish that a constructive trust is appropriate because CFTC cannot properly trace the funds in the receivership estate to the defrauded investors. (Starmark Response at 4-5; Presidential Response at 2). Second, as an alternative argument, Intervenors ask this Court to allow the intervenors to share in the receivership assets along with the defrauded investors on

---

[2]     Presidential's state court lawsuit named Momentum Trading Group, Ltd. d/b/a Orca Funds, Inc. as a Defendant. In this action, Momentum Trading Group, Ltd. and Orca Funds, Inc. are listed as separate entities.

[3]

        Presidential's Response is silent as to the amount of the Default Judgment which it obtained in the state court litigation.

a pro rata basis.  (Starmark Response at 7; Presidential Response at 5).  For the reasons articulated below, I find that both arguments are without merit.

## IV.    Courts Have Broad Discretion in Dealing With Receivership Estates

A district court has broad powers and discretion in determining appropriate relief in equity receivership cases.  *See SEC v. Elliot*, 953 F.2d 1560, 1569 (11th Cir. 1992).  The court's discretion derives from its inherent powers to fashion relief.  *See id.*  In this case, CFTC asks the Court to impose a constructive trust on the assets seized from Defendants and accept CFTC's proposed plan for distributing the receivership assets to those investors who were defrauded by Defendants on a pro rata basis.

A constructive trust is an equitable remedy designed to "prevent the unjust enrichment of culpable parties."  *Bender v. Centrust Mortgage Corp.*, 51 F.3d 1027, 1029 (11th Cir. 1995).  In determining whether a constructive trust is appropriate, federal courts must look to state law.  *See id.*; *see also City Nat'l Bank of Miami v. General Coffee Corp.*, 828 F.2d 699, 706 (11th Cir. 1987); *American Nat'l Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1541-42 (11th Cir. 1983).  The purpose of a constructive trust is to restore property to its rightful owner because the "beneficiary of a constructive trust is entitled to have his original interest restored" in his property which was wrongfully taken.  *See Allen v. Tatham*, 56 So. 2d 337, 340-41 (Fla. 1952); *see also Mayer v. Cianciolo*, 463 So. 2d 1219, 1221 (Fla. 3d DCA 1985); *Provence v. Palm Beach Taverns, Inc.,* 676 So. 2d 1022, 1025 (Fla. 4th DCA 1996); *Johnson v. Johnson*, 349 So. 2d 698, 699 (Fla. 4th DCA 1977).

## V.    A Constructive Trust Was Established

Under Florida law, a constructive trust is established where there is a "(1) promise, express or implied, (2) transfer of the property and reliance thereon, (3) a confidential

relationship and (4) unjust enrichment." *See Provence*, 676 So. 2d at 1025; *see also Saporta v. Saporta*, 766 So. 2d 379, 381 (Fla. 3d DCA 2000); *Abele v. Sawyer*, 747 So. 2d 415, 416 (Fla. 4th DCA 1999). A constructive trust will only be imposed on property "if the trust *res* is specific, identifiable property or if it can be clearly traced in assets of the defendant which are claimed by the party seeking such relief." *Finkelstein v. Southeast Bank, N.A.*, 490 So. 2d 976, 983-84 (Fla. 4th DCA 1986); *see also Heina v. La Chucua Paso Fino Horse Farm, Inc.*, 752 So. 2d 630, 637 n. 4 (Fla. 5th DCA 1999).

I find that the elements for a constructive trust have been met in this case. First, I have previously concluded that Defendants made false promise to the defrauded investors in this case. *See* November 14, 2003, Order of Permanent Injunction and Entry of Final Judgment of Default Against Defendants **[DE # 141]**. I found that Defendants solicited $13 million in investments from the defrauded investors for the "purpose of trading primarily foreign currency futures contracts." **[DE # 141 at 5]**. Instead of using those funds for trading as promised, Defendants "misappropriated a minimum of $10.6 million of those investor funds and used the money for business, personal and luxury expenditures." **[*Id.*]** At the time that Defendants solicited the funds from the defrauded investors, Defendants "made materially false statements about their experience and track record, sent fraudulent account statements, and made other blatant misrepresentations and falsifications." **[*Id.*]**

Second, CFTC has also proven that the defrauded investors transferred money to Defendants in reliance upon Defendants' promises. CFTC has introduced evidence into the record detailing the flow of funds from the defrauded investors to Defendants. **[*See* DE # 16, Fomersall Declaration]**. In the Declaration of Ms. Fomersall, a senior futures trading investigator at CFTC, she attests that she reviewed thousands of documents and

concluded that Defendant O'Neill and the corporate Defendants obtained a total of $13 million dollars from the defrauded investors. **[Id. at 3]**. Ms. Fomersall further attests that Defendants incurred net trading losses of $487,000.00 with the defrauded investors' funds but refunded $1.9 million to some of the investors. **[Id. at 2-3]**. She provided evidence, however, that Defendants misappropriated the balance of the investors' funds, approximately $10.6 million dollars. **[Id. at 3]**.

Ms. Fomersall's Declaration traces the misappropriation of the $10.6 million dollars in great detail. **[Id. at 3-13]**. She traces the flow of the funds from the investors to various bank accounts opened by Defendant O'Neill. **[Id.]**. She then traced the investors' funds as the funds were transferred to other bank accounts. **[Id.]**. Ms. Fomersall documented that the majority of the investors' funds were not used for trading. **[Id. at 10]**. Rather, a large amount of the funds were used to pay various personal and business expenses including gambling debts, real estate purchases, the services of a "call girl", investment advisor services, classic automobiles and expensive watches. **[Id. at 3, 10]**.

CFTC also provided additional information concerning the tracing of the receivership assets in its Reply. **[See DE # 168]**. In the Reply, CFTC traces "over 98% of the value of the assets of the receiver" to the defrauded investors. **[Id. at 2]**. CFTC has provided record evidence in the Reply to show that Defendant O'Neill used the funds given by the investors to the corporate Defendants to purchase three residential properties, to open two bank accounts and to purchase jewelry and furniture. **[Id. at 3-5]**.

CFTC also provided evidence that $70,000.00 of the receivership estate was from Relief Defendant Nancy Iagrossi as a disgorgement payment pursuant to a Consent Order in this case. **[Id. at 5]**. CFTC provided record evidence that prior to fraudulently obtaining funds from the investors through false misrepresentations, Defendant O'Neill

had no significant sources of income.  **[Id.]**.  Based on the uncontradicted record evidence provided by the Declaration of Ms. Fomersall and in CFTC's Reply, I conclude that CFTC has shown clear and convincing evidence that the funds in the receivership estate are traceable to the funds originally invested by the defrauded investors.

I also find that CFTC established that the third and fourth elements of the constructive trust are met in this case.  I earlier found that Defendants, who the defrauded investors trusted with their money, were in a confidential relationship with the defrauded investors. **[Id. at 5, 8]**.  In reliance upon Defendants' false promises and misstatements, the defrauded investors entrusted Defendants with substantial sums of money to invest. **[Id.]** Instead of using these funds for the purposes which the defrauded investors intended, Defendants misappropriated the funds to finance an "extravagant lifestyle" that included the purchase of real estate worth millions of dollars, automobiles, airplane charters, gambling trips and gifts to family members.   **[Id. at 5]**.  Defendants were unjustly enriched by defrauding these investors and misappropriating their money.

Intervenors only challenge CFTC's ability to prove the second element of the constructive trust test.  Intervenors argue that no constructive trust has been established because CFTC "does not clearly trace the assets in the receivership to defendants' fraudulent conduct" and it "provides little support for its blanket statement that the entire contents of the Receivership Estate are traceable to the defrauded investors." (Presidential Response at 3; Starmark Response at 5).  I disagree and find that CFTC has met its burden of tracing the funds in the receivership estate to the defrauded investors.  In both the Declaration of Ms. Fomersall and in CFTC's Reply, which was filed after Intervenors filed their Responses, CFTC provided clear and convincing evidence

that funds in the Receivership Estate are traceable to the investment of the defrauded investors.

As I explained above, in the Reply, CFTC provided additional specific evidence tracing 98% of the source of the receivership assets to the defrauded investors. Combined with the detailed record evidence provided by Ms. Fomersall in her Declaration, I conclude that CFTC has met its burden of showing, by clear and convincing evidence, that the funds in the receivership estate are from the defrauded investors.   Accordingly, I find that CFTC has established that the assets in the receivership estate are held in a constructive trust for the benefit of the defrauded investors.

### VI.    No Judgment Lien Attached to the Assets in the Receivership Estate

As an alternative argument, the Intervenors maintain that they should be allowed to participate in the distribution of the receivership assets because they hold valid judgment liens against some of the Defendants.   Intervenors claim that because they obtained judgments against some of the Defendants in this case prior to my entering final judgment in favor of CFTC, their judgment liens take priority over the claims of the defrauded investors.   (Starmark Response at 7, stating "Starmark's judgment against Orca and Momentum and its perfect lien against all of the personal assets of those corporations, predates the filing of this action by the Commission . . . the Commission's judgment takes a backseat to Starmark's judgment and perfected lien."; Presidential Response at 6, stating "Under Florida law, priority among competing judgment liens is determined by date and time of filing.   Fla. Stat. § 55.202(2)(c)(3).   Presidential thus has priority under Florida law over the CFTC.")   I disagree and find that Intervenors' arguments mischaracterize Florida judgment lien law for two reasons.

1.    Judgment Liens Only Attach to the Property of the Judgment Debtor

First, judgment liens on personal property in Florida only attach to property in which the debtor has an interest.  *See* Fla. Stat. § 55.202(2)(c); *see also* Fla. Stat. § 55.205(1).  Fla. Stat. § 55.202 governs judgment liens on personal property in Florida. Section § 55.205 establishes the effect of judgment liens.  Section § 55.205(1)  makes clear that "[a] valid judgment lien gives the judgment creditor the right to proceed against *the property of the debtor* through writ of execution, garnishment, or other judicial process." (emphasis added).   This concept is reiterated throughout Florida Statutes Chapter 55.  *See* § 55.202(2) ("A judgment lien may be acquired on a judgment debtor's interest in all personal property in this state subject to execution under § 56.061, other than . . ."; *see also* § 55.202(c), "Although no lien attaches to property, and a creditor does not become a lien creditor as to liens under chapter 679, until the debtor acquires an interest in the property . . . ").  A judgment creditor only has a lien on property in which the debtor has an interest.  *See id.; see also First Nat'l Bank v. Peel*, 145 So. 177, 178 (Fla. 1932) (holding that "a judgment of a court of law is not a lien upon land to which the judgment debtor has no legal title"); *Fryer v. Morgan,* 714 So. 2d 542, 544 (Fla. 3d DCA 1998).

I have determined that a constructive trust was imposed on the receivership estate because the funds in the estate were derived from the defrauded investors.   The purpose of the constructive trust remedy is to "restore property to the rightful owner and to prevent unjust enrichment." *Provence*, 676 So. 2d at 1025.  Accordingly, the funds in the receivership estate did not belong to Defendants but to the defrauded investors from whom the funds came.  As a judgment lien only attaches to the property of the judgment debtor, there are no funds in the constructive trust to which Intervenors' judgment liens may attach.

I have not found, and the parties have not cited any Eleventh Circuit case law directly addressing the issues presented in this case. I find instructive, however, two district court cases, including one from this district, that conclude that Internal Revenue Service tax liens do not attach to funds in a constructive trust because "by definition, once the constructive trust arises, the taxpayer as constructive trustee lacks a sufficient interest in the property to allow attachment of a tax lien." *State of Florida v. United States*, 1989 WL 91135, at * 3 (S.D. Fla. June 28, 1989); *see also Nat'l City Bank v. Stash Brothers, Inc., et al.*, 1998 WL 684182, at * 2 (W.D. Pa. May 22, 1998) (concluding that it is "true that the existence of even an unrecorded constructive trust in assets upon which the IRS has recorded or noticed a federal tax lien *may* defeat such a lien where, under applicable state law, the equitable interest in the liened property renders the lien upon the legal title ineffective.

Moreover, I find further support for my conclusion that Intervenors' judgment liens do not attach in an Eleventh Circuit case, *Bender v. Centrust Mortgage Corp.*, 51 F.3d 1027, 1030 (11th Cir. 1995). Although the facts in the *Bender* case are not identical to the facts in this case, the *Bender* court's finding that "[i]t is axiomatic that a constructive trust is inappropriate relief for the mere failure to pay a debt" is appropriate to apply in this case. 51 F. 3d at 1030. In this case, Intervenors argue that their status as judgment lien holders allows them to participate in the distribution of the constructive trust assets. Intervenors' liens are judgment liens based on failure of certain Defendants to pay debts, however. If a constructive lien cannot be imposed for the "mere failure to pay a debt", Intervenors cannot partake in the distribution of a constructive trust *once imposed* for the failure to pay a debt. *See id.*

2.    Judgment Liens Do Not Attach to Money

Intervenors argue that their judgment liens entitle them to share in a pro rata division of the receivership assets under Florida law.    (Starmark Response at 7; Presidential Response at 6).  Intervenors misstate Florida law.

As I explained above, Fla. Stat. § 55.202 governs judgment liens on personal property in Florida.  Section  § 55.202(2) makes clear that a "judgment lien may be acquired on a judgment debtor's interest in all personal property in this state subject to execution under § 56.061, *other than* fixtures, *money*, negotiable instruments, and mortgages." (emphasis added).  Intervenors insist that they are entitled to participate in the distribution of the $ 551,284.82 in receivership assets because they are judgment lienors under Florida law.   However, Section § 55.202(2) clearly provides that judgment liens do not attach to money.  Therefore, Intervenors' judgment lien is does not attach to the money in the receivership estate and Intervenors are not entitled to any distribution from the estate.

Accordingly, I conclude that all the assets in the receivership estate, except the costs of the Receiver as approved by the Court, will be used to satisfy Defendants' restitution obligation to the defrauded investors in accordance with the Supplemental Order of Judgment on Restitution and Civil Monetary Penalties Against Defendants on June 15, 2004 **[DE # 154]**.  It is hereby **ORDERED AND ADJUDGED** that:

1.    RESTITUTION:  Pursuant to the Court's June 15, 2004 Supplemental Order of Judgment **[DE # 154]**, Defendants shall pay restitution in the amount of $11,519,659.67 plus pre-judgment interest thereon from October 1, 2002 through to September 30, 2003, in the amount of $626,852.33, for a total of $12,146,512 ("Restitution Obligation").  Interest after the date of this Order until the restitution is paid in

full shall be paid at the post-judgment interest rate set forth in 28 U.S.C. § 1961. Attachment A, attached hereto, includes the names and last known addresses of the investors to whom restitution shall be made pursuant to this paragraph, together with the *pro-rata* distribution percentage by which each investor shall be paid. Omission from Attachment A shall in no way limit any investor from seeking recovery from the Defendants, or any other person or entity. Further, the amounts contained in Attachment A shall not limit the ability of any investor from proving that a greater amount is owed, and nothing herein shall be construed in any way to limit or abridge the rights of any investor that exist under state or common law.

2. <u>PAYMENT OF RESTITUTION</u>: Restitution shall be made as follows:

    a. The National Futures Association is designated as Monitor to oversee any restitution payments made by Defendants pursuant to this Order.

    b. Any restitution payments by the Defendants will be by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, made payable to the National Futures Association and sent to Daniel A. Driscoll, Executive Vice President, Chief Compliance Officer, or his successor; National Futures Association, 200 Madison Street, Chicago, IL 60606, under cover of a letter that identifies the Defendants and the name and docket number of this proceeding. Defendants will simultaneously transmit a copy of the cover letter and the form of payment to the Monitor and to the Director, Division of Enforcement, U.S. Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, DC 20581.

    c. The Court-appointed Receiver will transfer the balance of the funds in its possession held in the Receivership Estate to the Monitor for disbursement to investors, minus $50,000.00, which it will retain to cover any future fees and expenses it incurs up until the receivership is terminated. Upon termination of the receivership by order of the Court, the balance of those funds in the receivership estate will be transferred to the Monitor, minus any fees and costs the Receiver incurs and that are approved by order of the Court.

    d. The Monitor shall distribute the funds it receives from the Receiver and Defendants to investors in accordance with Attachment A, which lists each investor's *pro-rata* share of the restitution award. Such distribution

shall reduce the Defendants' restitution obligation to investors on a dollar-for-dollar basis.

e.  The Monitor can utilize the information contained in Attachment A and monthly account statements in the possession of the CFTC to notify individuals who invested with Defendants of the results of these proceedings and to provide reasonable notice that a partial distribution will be made.  The Monitor is authorized to limit said distribution to those individuals who respond to the notice within a reasonable period of time to be determined within the sound discretion of the Monitor. Any customer who did not respond to the notice would not participate in the distribution of currently available funds, or in the distribution of any future funds.

f.  For those individuals that do not have an address listed in Attachment A, the Monitor, with the assistance of the CFTC, shall make a diligent effort in contacting those customers, and if after such effort, the Monitor is unable to contact them, the disbursement share of those customers shall be distributed among the remaining customers based on their new *pro rata* share.

g.  For those customers that have assigned their interest in the restitution claim, the Monitor will distribute those customers' *pro rata* share to their assignees.

3.  THIRD-PARTY BENEFICIARIES:  Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each of the individuals identified in Attachment A is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution amount which has not been paid by the Defendants, to ensure continued compliance with any provision of this Order and to hold the Defendants in contempt for any violations of any provision of this Order.

4.  COLLATERAL AGREEMENTS:  The Defendants shall immediately notify the Commission if they make or have previously made any agreement with any investor obligating them to make payments outside of this Order.   They shall also provide immediate evidence to the Court, to the Monitor, and to the Commission of any payments made pursuant to such agreement.   Upon being notified of any payments made by the Defendants to investors outside of this Order, and receiving evidence of such payments,

the Commission and the Monitor will have the right to reduce and offset the Defendants' obligation to specified investors, and to make any other changes in the restitution distribution schedule that they deem appropriate.

5.    TRANSFER OF ASSETS:   The Defendants shall not transfer or cause others to transfer funds or other property to the custody, possession, or control of any other person for the purpose of concealing such funds from the Court, the Commission, the Monitor or any investor or until the Restitution Amounts and the Civil Monetary Penalty have been paid in full.

6.    JOINT AND SEVERAL LIABILITY: Defendants are jointly and severally liable for the Restitution Obligation as well as the Civil Monetary Penalty ordered by the Court's June 15, 2004 Supplemental Order of Judgment on Restitution and Civil Monetary Penalties Against Defendants **[DE # 154]**.

7.    CONTINUATION OF THE RECEIVERSHIP:   The receivership will remain in effect until the Receiver's ancillary complaint against Elite Golf Cruises, LLC filed on May 14, 2003 for unjust enrichment **[DE # 104]** is concluded.   The Court schedules a telephonic status conference on **March 15, 2005 at 8:45 am** to discuss the status of the ancillary action between CFTC and Elite Golf Cruises, LLC.  The Court will send a notice setting telephonic status conference with call-in directions separately.

8.    NOTICES.  All notices required by this Order shall be sent by certified mail, return receipt requested, as follows:

        a.    Notice to CFTC:
              Director, Division of Enforcement
              Commodity Futures Trading Commission
              1155 21st St. NW
              Washington, DC 20581

b.    Notice to the Monitor:

Vice President, Compliance
National Futures Association
200 West Madison Street
Chicago, IL 60606

c.    Notice to the Defendants:

Donald O'Neill
Inmate Register Number: 26249-050
Miami Federal Detention Center
33 NE 4th Street
Miami, FL 33132

9.    SUCCESSORS AND ASSIGNS.   This Order shall inure to the benefit of and be binding on the parties' successors, assigns, heirs, beneficiaries and administrators.

10.    JURISDICTION.   This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

**DONE AND ORDERED**, in Chambers, on this _15_ day of _Feb_, 2005.

_____
The Honorable Alan S. Gold
UNITED STATES DISTRICT COURT JUDGE

Copies furnished to:
**US Magistrate Judge Andrea Simonton**

**Ghassan Hitti, Esq.**
1155 21st St., NW
Washington, DC 20581

**Donald O'Neill, *pro se***
Inmate Register Number: 26249-050
Miami Federal Detention Center
33 NE 4th Street
Miami, FL 33132

**Gerald Wald, Esq. (Receiver)**
900 Ingraham Building
25 SE 2nd Avenue, Miami, FL 33131

**Joseph M. Goldstein, Esq.**

*Attorney for Starmark Int'l, Inc.*
200 East Broward Blvd.
Wachovia Center, Suite 2000
Fort Lauderdale, FL 33301

**Alan H. Fein, Esq.**
*Attorney for Presidential Aviation*
150 West Flagler Street
Suite 2200, Museum Tower
Miami, FL 33130

**Scott Alan Mager, Esq.**
*Attorney for Elite Golf Cruises*
Mager and Associates
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, FL 33301

**Jeannette Lewis Bologna, Esq.**
*Attorney for Michelle Knipp*
Haggard Parks Haggard and Bologna
330 Alhambra Circle
1st Floor
Coral Gables, FL 33134

**Howard J. Schumacker, Esq.**
*Attorney for Robert O'Neill*
Suite 700
1 E. Broward Boulevard
Fort Lauderdale, FL 33301

**Danielle Iagrossi, f.k.a. Danielle O'Neill** (*pro se* relief defendant)
102 NE 13th Street
Delray Beach, FL 33444

**Nancy Iagrossi** (*pro se* relief defendant)
102 NE 13th Street
Delray Beach, FL 33444

**Attachment A**
**Restitution Distribution Plan**

| Name | Contact Information | Assignee | Entity Invested | Amount Invested | Amount Returned | Amount Owed | Pro rata share |
|---|---|---|---|---|---|---|---|
| Alexander, James | Trust Company of America FBO, 7103 S. Revere Parkway, Englewoods, CO 80112 | | Orca Capital Fund A | $ 65,000.00 | $ - | $ 65,000.00 | 0.5348% |
| Bagden, Steve | 11690 SW 25th Street, Davies, FL 33325 | | Orca Capital Fund A | $ 50,000.00 | $ 7,233.00 | $ 42,767.00 | 0.3518% |
| BFI Forex Fund | c/o Karen Ullely, General Partner Benchmark, Inc. 3573 E. Sunrise Drive, Suite 125 Tuscon, AZ 85718 Fax: (520) 615-9789 | | Shelaley Holdings | $ 500,000.00 | $ 206,554.71 | $ 293,445.29 | 2.4142% |
| Collett, Noel - Oakberry Group | Noel Collett, 5 Hinrichsen Road – Tarome Qld 4309 Australia email: ncollett@hypermax.net.au +61 7 5463 8145(p) +61 7 5463 8145(f)           email: ncollett@hypermax.net.au | | Orca Capital Fund A | $ 40,000.00 | $ - | $ 40,000.00 | 0.3291% |
| Cooper, Stephen | 4420 West Culbreath Avenue, Tampa FL 33609                             813 287-8709 (p), 813-286-1553 (f) | | Orca Capital Fund A | $ 50,000.00 | $ - | $ 50,000.00 | 0.4113% |
| Duskie, Mary Jane | 4113 Carriage Drive, Pompano Beach, FL 33069  (954) 977-9599 Attorney: George Weidenger, Esq. (352) 591-6077 | | Orca Capital Fund A | $ 100,000.00 | $ - | $ 100,000.00 | 0.8227% |
| Eisenberg, Lawrence | Lawrence Eisenberg 1700 Wisconsin Avenue Washington, DC  20007 | | Momentum Trading | $ 30,000.00 | $ - | $ 30,000.00 | 0.2468% |
| Holt, David and Nancy | ABC Distributing Inc., 6301 E 10th Avenue, Miami, FL 33013 | | Orca Capital Fund A | $ 100,000.00 | $ - | $ 100,000.00 | 0.8227% |
| Hopi Tribal Housing Authority | c/o Frank Hoover, Esq., Mangum, Wall, Stoops and Warden, PLLC 100 North Elden, PO Box 10, Flagstaff, Arizona 86002-0010 (928) 779-6951 (p) | National Union Fire Insurance Company c/o Thomas W. Hanlon, Esq. D'Amato & Lynch 70 Pine Street New York, NY 10270 | Orca Hopi | $ 2,900,000.00 | $ 108,568.31 | $ 2,791,431.69 | 22.9650% |
| House, Paul | No contact information available | | | $ 48,000.00 | $ - | $ 48,000.00 | 0.3949% |
| Investissement's Role Ltee | No contact information available | | | $ 250,000.00 | $ - | $ 250,000.00 | 2.0567% |

**Attachment A**
**Restitution Distribution Plan**

| Name | Contact Information | Assignee | Entity Invested | Amount Invested | Amount Returned | Amount Owed | Pro rata share |
|---|---|---|---|---|---|---|---|
| JK Mortgage - Kip Reeves and John McCorey | 888 S. Andrews Avenue #203 Ft. Lauderdale, FL 33316 | | Orca Capital Fund A | $ 50,000.00 | $ - | $ 50,000.00 | 0.4113% |
| Mohave Tribal Corporation | Gary Goforth, Tribal Administrator, Ft. Mohave Indian Tribe Legal Dept. 8490 South Highway 95, Suite 105, Mohave Valley, AZ 86440     760-629-5760 | National Union Fire Insurance Company c/o Thomas W. Hanlon, Esq. D'Amato & Lynch 70 Pine Street New York, NY 10270 | Orca Mohave | $ 6,950,000.00 | $ 1,108,944.08 | $ 5,841,055.92 | 48.0541% |
| Pacific Trading Group | c/o Bill Saedlo, 934 Hermosa Avenue, Suite 12, Hermosa Beach, CA 90254 (310) 372-6777 | | Shelaley Holdings | $ 600,000.00 | $ 174,941.66 | $ 425,058.34 | 3.4969% |
| Paquette, Jean Pierre | Jean Pierre Paquette 732 Mccrea, Apt. 201 , Sherberooke, Quebec, Canada J1L2M5  (418) 368-2227 | | NDT Fund LLC | $ 12,500.00 | $ - | $ 12,500.00 | 0.1028% |
| Pearson, Kaye and Cheryl | Yachting Promotions, 1115 NE 9th Ave. Ft. Lauderdale, FL 33304 | | Orca Capital Fund A | $ 100,000.00 | $ - | $ 100,000.00 | 0.8227% |
| Placements Korin | No contact information available | | NDT Fund LLC | $ 950,000.00 | $ - | $ 950,000.00 | 7.8156% |
| Rothchild, Raegan aka Our Own Heritage Trust | Raegan Rothchilde 747 South East Lakeview Drive Sebring, Florida 33870 | | Orca Capital Fund A | $ 100,000.00 | $ - | $ 100,000.00 | 0.8227% |
| Roe, Bruce and Nancy | No contact information available | | Orca Capital Fund A | $ 100,000.00 | $ - | $ 100,000.00 | 0.8227% |
| Eversoll, Steve aka Jisk Enterprises | 22 Saddlebrook Garden, London, KY 40744 | | Orca Capital Fund A | $ 750,000.00 | $ 159,075.00 | $ 590,925.00 | 4.8615% |
| Vandershoot, Aryan aka Schetten En Co NV | Arjan Van Der Schoot 447 Coral Way Ft. Lauderdale, FL 33301 | | Orca Capital Fund A | $ 149,980.00 | $ - | $ 149,980.00 | 1.2339% |
| Waddington, Preston | 2699 Sterling Road, B#304, Ft. Lauderdale, FL 33312   954-989-3120 | | Orca Capital Fund A | $ 25,000.00 | $ - | $ 25,000.00 | 0.2057% |
| | | | | $ 14,202,775.00 | $ 2,136,178.30 | $ 12,155,163.24 | 100.0000% |